The first case is Setzer v. Omega Healthcare. May it please the Court, Jacob Goldberg on behalf of Appellant Setzer Holtzman, I'm reserving three minutes. The District Court dismissed for lack of scienter, holding that there was no clear duty to disclose, but Item 303 provides a clear, obvious, and simple duty to disclose, and there really is no way out of this. Item 303A.3.1 states clearly that issuers must describe any unusual or infrequent events or transactions that materially affect the amount of reported income. Well, isn't the problem here that Omega did disclose the trend of operator problems in its 10-Q filings for the second and third quarters? Your Honor, they disclosed a 45-day delinquency, and without needing to get caught up in whether they disclosed that in positive light or negative light, they certainly disclosed that. What they didn't do, Your Honor, was disclose that the trend was continuing, because but for the loan, they are 75 days delinquent and not 45. And but for the loan at the end of the second quarter, they are 135 days delinquent and not 90. But, Your Honor, if I may, let me say the In other words, the landlord, the Omega, the landlord, disclosed in its 10-Q that they are 90 days delinquent, and they're only 90 days delinquent because the landlord has paid 45 days of their rent for them through the loan, transferring the loan obligation transferring the rent obligation into an undisclosed loan obligation. Yes, yes, Judge LaValle, that's what they've done. But if I could step back even further and put trend to a side for a second, because I think we prevail on trend, but I ask you please to focus on unusual or infrequent events or transactions that affect operating results. In the first quarter of 2017, Omega reported $109 million of net income. 11 million of those dollars, or over 10 percent, were monies that it would not have been able to report but for the loan. That's 10 percent. If you look at their funds from operations You mean by that, that they wouldn't have had that income but for the loan. They made a loan, they essentially made the rental payments for Oriana and reported that as income. Yes, Your Honor, that's exactly what they did. They reported their own cash as income. That is not improper. That does not violate GAAP. But if we consider together the purpose of item 303, it is issuer, registrant, you have disclosed accurate financial statements. Is there anything else that we must know for us to assess those financial statements? 10 percent of net income for the first quarter, 10 percent was the loan. Of the funds from operation of $180 million during the quarter, 6 percent is from the loan. Those numbers are material. And because those numbers are material, and because there is no wiggle room in section 1 of item 303, with respect, Judge Livingston, not to trends but to actual events, Omega was required to disclose this loan. Without it, analysts cannot assess the quality, the source, and the recurring nature of that rent payment. They're in the dark. With respect to that payment alone, and their ---- So I'm making sure I understand. So the event, the infrequent event that you're focusing on is the loan itself? Yes, Your Honor. It is the loan. The fact of the loan, the fact of a $15 million loan to Omega's situation? Yes. That but for that loan, they could not pay rent. The delinquency was increasing. Well, Omega doesn't pay rent, right? I beg your pardon. I'm so sorry. So you're saying, so the event is the $15 million loan made by Omega, and the reporting obligation is Omega's. So the $15 million event is of sufficient importance that to understand Omega's situation, they needed to report that Oriana otherwise couldn't have paid rent. Under any standard, Your Honor, as the district court found, it's material. And therefore I think you make a very good case that it's material because, and the district court to some degree agreed with you. But what about the Siena side of this? Sure. And there's no self-dealing. There's no enrichment of anybody within the corporation itself. And so, and you pretty much concede that you don't, you haven't pled any of that. That's not your fault. I mean, just because you don't have facts to plead. But, but so you hang your hat on recklessness and that's where the 303 argument starts to come in, right? It does, Your Honor. And if I could take you please to Judge Livingston's opinion in, in Stratt McClure. Okay. And also Judge Stratt McClure, Your Honor, Stratt McClure, the, the Morgan Stanley case, and also Judge Lohier's case in SAIC. If you juxtapose those cases one to the process of assessing the actual issue. Whereas in the SAIC case, SAIC had already completed its investigation and was well aware of the rogue employee who had cost the City of New York $600 million. I'm familiar with the case. Judge Lohier found Sienter. Judge Livingston did not. Therefore. This was, let's carry that out for a second. This was a situation where Omega disclosed that Oriana was experiencing difficulties and, and was short already with regard to its rent, 45 days short on rent. That it had proposed certain remedies. It was selling off seven of its, of its nursing homes within the, the north, in a certain segment of the, of the country. And that's three were already under contract. That they had also were retooling their management. They were doing a number of things. They expressed some limited optimism that it was, that it was going to work out. But that, you know, there was, there's no kind of representation that they were clear of it because they had, they still had significant shortfalls. How is that, how is that then that they knew that things were, I mean, how is that that they had somehow identified and knew of the risk so that, that they didn't disclose? I mean, they loaned, they loaned, they made a $15 million loan. They did disclose that they made the loan. Does that indicate that they, they were hopeful or that for some reason they wanted to fool all their investors? And you don't just give money to somebody thinking that they're not going to pay it back. You don't, but you do if you are forestalling a potential problem, Your Honor. For what reason? For what reason? So, Your Honor, as just... Hoping that, thinking that, that indeed they are going to pull out of it? Yes, Your Honor. Can't they be hopeful? Yes, absolutely. We don't question any opinion they made. Then, then is it reckless for them to not disclose it? Yes, Your Honor, because the fact of the loan and what it hid is not only material, as I think you and I would agree, but it's a hard and fast fact. Fact. They lent Oriana $15 million, without which Oriana could not pay its rent. At the time they lent Oriana that money on May 2nd of 2017, Oriana was at that point plus 75 days delinquent. Without that loan, what we know is that they would have been 135 days delinquent, because at the end of the second... Would have gone to cash accrual. Your Honor, I don't... Which is the event which then caused the 4% tumble, right? Yes, their inability to pay rent ultimately causes Omega to believe that the situation is hopeless. However, the difference between any opinion case and this is, and I direct the Court to the Supreme Court's Omnicare opinion. An opinion is okay. We are not challenging their opinions. However, when you make that opinion, when you say, and again, you and I don't have to quibble about whether they were overwhelmingly positive, a little positive or negative... Well, this is a pleading case anyhow, so... Okay. We are comfortable with... We have investigated this plan thoroughly. It is afoot and has been since early 2016, and we are comfortable that this operator will recover, so we are not revising our guidance. When you say that, that's okay. They actually could have held that opinion, Judge Wesley. However, the hard and fast facts that they were actually but for the loan 75 days delinquent, that there was no prospect for Oriana to resume paying rent at that time, and we know that because they did not pay in the second quarter, that the fact of the loan alerts investors that the risk is materially greater than what defendants disclosed. What they disclosed in July was sufficient to make the stock price go down by 4%. It did. It did because for the first... It was pretty cautionary. It was cautionary. They expressed cautious optimism, and as Your Honor will recall, we pleaded July as a partial disclosure because in July, for the first time, they start to discuss with the market the possibility of cash accrual. So now the market has an inkling notwithstanding defendants' cautious optimism, but I will say again that for the six months ended June 30th, Oriana's delinquency was now not $10 million or $11 million but for the loan. It was $22 million but for the loan. And again, in the context of the six-month results, that means that that is material and that without that disclosure, no one can assess, investors cannot assess the quality of the revenue, the net income, and ultimately the funds from operations, which are the reporting metric that is so critical. Isn't that a fair inference that the motivation of the loan was to keep a tenant afloat who was responsible for such an important part of Omega's income? Judge LaValle, in the context of Judge Wesley's comment, yes. All right. So the reason they — it's a fair inference that this is not, hey, we've got a great lending opportunity. We know about somebody because of our inside connections who we can make a wonderful loan to. This is a company that is in danger of failing. And Oriana, I mean. And the motivation for lending to them is because their ability to keep paying us so much, such a large part of our income, is very important to our financial success, our financial statements, correct? Yes. It is not incongruous for Omega to have believed both that there was a materially greater problem and that their optimism was what was deserved. And isn't it also a fair inference that had they revealed that, you know, the — that Oriana's payment of the amount of rent that they did pay in that period was only because we paid it for them, we transferred their rent obligation into loan obligation? If that had been revealed to the market, isn't it a fair inference that that would have been very bad for Omega's stock? Your Honor, I don't want to — to prognosticate about what would have happened. We're here to determine whether there was a clear duty that was material — But I'm asking you a different question. Isn't it a fair inference — isn't it a fair inference that the stock market would have — would have reacted badly with respect to Omega's stock by information that a major tenant that is responsible for approximately 7 percent of Omega's income by its rental payments can only pay the rent because Omega's paying it for them? Yes, Your Honor. That would have been bad news in the stock market. I — It would predictably make the stock go down. Is there any doubt about that? No, I don't think so, Your Honor. I don't. And as just — now Justice Alito wrote in Oren v. Stafford when he was on the Third Circuit, among the indicia of materiality is the fall at the end of the class period. And to the extent analysts believed and investors believed that the stock — that Oriana's problems were deepening and deeper, then that certainly should have caused — if it was material, should have caused the stock to go down. And what we know now is Judge Buchwald herself decided, and I think we all agree, that the loan was material. Yeah. I guess my — the thing that's troubling me, and I'm trying to figure out, and so I'll ask you, the standard's recklessness on Sienta. So recklessness — I've used my old state court training. Recklessness is knowing disregard of a risk, right? And so could you extrapolate for me for what your view then is? What were the — how was this reckless? And then I won't trouble you again. No, no, no. No trouble at all. So with a clear duty, and I think Item 303 establishes, plus everything they said establishes that clear duty. Step one is 303. Step one. It requires them to disclose. Exactly. And it's known and it's obvious. Step two, is it material? I think that Judge Buchwald found it was, and I'm not hearing that we disagree that the loan was material. Then step three is, did they know about it? There could be a case where the duty exists, the fact is material, but defendants had no knowledge. The complaint can't plead that they had the loan. So go ahead. Well, no, no. I'm talking generally. Oh, okay. In this particular case, Judge Wesley, yes, there's no question they knew about the loan. They knew they made the loan. Sure. Right. As Judge Buchwald said, there's no fair reading of this that says that they didn't make a decision not to disclose. That's what Her Honor said in the transcript, in the hearing. So I think that the answer to your question is, if duty, if materiality, and if actual knowledge of the fact, that's the ballgame, because in that instance, defendants again can be positive and think to themselves, well, we don't want to disclose the loan. We want everyone to think that things are positive as we see them. But that doesn't matter, because in that instance, they're minimally reckless for their failure to disclose a fact they had a duty to disclose that is material and of which they had actual knowledge. And that's Judge Lohier's, that's the distinction between Judge Lohier's opinion in SAIC and Judge Livingston's in Strat McClure. And one final point about this, and I think that this is another critical point. If I tell you, Judge Wesley, that I have a million-dollar problem, I may also then ‑‑ I may have a million, $6,000 problem. And if I fail to disclose the additional $6,000, you might say to me, Goldberg, I don't really care about $6,000. It's less than 1%. But if I tell you that I have a million-dollar problem when I actually have a $1.6 million problem, now we're talking a different story. I think we'd agree. If you extrapolate from that example and apply it to this case, 75 days delinquency is a 67% greater amount of time delinquent than 45. And 135, if I was numeratologist Wesley, I'd tell you the percentage, I don't know it, but it's great enough to be the $1.6 million in our example. And so I think it's critical for the court to recognize that even as they disclose the 45 days, and they did, there's no question, it's in our complaint, the problem for defendants is, if the magnitude is materially greater, if the problem isn't a seed but an overgrown field, they must disclose that the field is overgrown. They can't simply say there's a seed that might become an overgrown field. Thank you. Good morning, Your Honor. Eric Ryder, Brian Cave for Defendants' Appeal Ease. May it please the Court. The disclosures that were made on October 30th and 31st by Omega concerning Oriana were not a bolt from the blue. It's not a case where the plaintiffs are alleging that no one knew before those disclosures that this tenant was having serious problems. It's undisputed that in the two quarters prior to that, the only two quarters of disclosures that are challenged here, disclosures in May for the first quarter and July-slash-August for the second quarter, Omega disclosed that Oriana was having problems, was behind in its rent, was engaged in a recovery plan, had fallen below a minimum target for financial health for tenant operators, and disclosed that the backlog got worse over those two quarters, and then disclosed that impairment in cash basis accounting were in prospect, leading to the stock price drop in July that Judge Livingston referred to. You don't dispute, do you, that were it not for the — that it's a fair inference of the complaint, that were it not for the loan, when Omega disclosed 90 days overdue on rental payments, it would have been 135 days overdue on rental payments were it not for the fact that Omega paid — paid 45 days of the rent for the tenant? Your Honor, with respect to that issue, for the first quarter, the loan couldn't have affected the first quarter calculations because the loan was — I didn't ask you about that. I didn't ask you about that. I asked you about the 90-day overdue that they, as of June 30th, the 10-Q said 90 days overdue, or the answers that they gave to analysts. I think it was in the 10-Q. They said two of our tenants, one of which was Oriana, was 90 days overdue on rent approximately, right? In terms of — there may be an inference that could be drawn regarding the number of days late, but Judge Buchwald's finding on that, as supported by the record, is that even with respect to the second quarter, there is no gap violation or no financial statement inaccuracy in the way — Just let me finish. Isn't it the fair inference of the complaint that when the 10-Q said that this tenant is 90 days overdue, the tenant would have been 135 days overdue had Omega not provided the wherewithal by making a loan, had not essentially paid 45 days of the rent? I don't believe that the record supports a specific number of days. It's a fair inference. It's a fair inference that — What is pleaded in the complaint? They were 45 days overdue at the end of the previous quarter. Omega makes them a $19 million loan or however — It's a $15 million loan. $15 million loan. Then at the end of the next quarter, they are declared to be 45 more days overdue It's not the fair inference that their ability to pay some of the rent, apparently they paid 45 days of the 90 days. That is a conceivable inference. Not a likely inference? It's not a strongly pleaded inference for this purpose, but it is a conceivable inference. But the issue here is whether the defendants knew that they had disclosed this loan and chose not to do it or were reckless about not doing it. That's the inquiry under the Stratton-McClure case that counsel has relied on. That's the scienter issue there. And given what they did disclose — Suppose that the complaint pleaded the following facts. Supposing that the complaint pleaded all the same facts that we had here, but added this, that members of — that the chief executive of Omega had a conversation with another person on his team, and they said, gee, it will be really bad for our stock Given how important Oriana is to our finances in that it pays its rental payments amount to 7% of our income, it would be really bad for our stock if the market found out how far in arrears they are. So in order that the market not find out, that the stock market analyst not find out how badly in arrears Oriana is, it would be very helpful if we provide financing by a loan that enables Oriana to pay its rent for a period of time. So we won't tell the market about how far in arrears they really are because we'll pay it for them by a rent, and we won't tell anybody. Would that make it a sufficient complaint? Your Honor — Would that be a sufficient — That's a very different — Would that be a sufficient complaint? I'm not sure whether that complaint would serve. You don't think that would be a sufficient complaint? But I do think — Would you answer my question? Would that be a sufficient complaint? I'm not sure that would be a sufficient complaint, but even if it — assume it is a sufficient complaint. Assume it is a sufficient complaint, it presents a dramatically different factual scenario here. The quarter you're talking about, the second quarter, is the quarter when Omega disclosed sufficiently negative information regarding Oriana and the situation that it caused a stock price drop. My hypothetical is that all the rest of the facts are the same, that if coupled with the facts you're saying now, on my facts, Omega declared Oriana's having trouble, said all the things, all the warning things that they said here, but in addition the complaint alleged this conversation. And if that would be a sufficient complaint, why isn't it the same if the fair inference of the complaint is that that was what Omega's motivation was? Because that's not a fair inference of the complaint. Now, the fair inference of the complaint is that they made a loan believing that this tenant was working through problems and that they expressed faith in the tenant's ability to recover by making that loan. As Judge Buchwald said, you wouldn't make a loan believing the tenant had no chance of recovery. So your argument on Sienter is there are two narratives. You'd probably say the more plausible narrative from this complaint is that they made a loan. They had a tenant that was having problems. It was doing a work through. As they said in their disclosures, it's like we could be the CEO. We know what's going on over there. They have a plan. They made them a loan hoping that plan would work out. But at the same time, they said it might not. They told the market that. They're in arrears. It could get worse. By July, those cautionary instructions were serious enough that the stock price was affected by the cautionary. That that's plausible, that that's what they were doing, helping to make a loan, expecting to be repaid, and thinking that the problems, cautious optimism, the problems will be worked out. And that's not Sienter. The other narrative is that they were concealing the extent to which the rent was in arrears. They weren't concealing that the rent was in arrears, the extent to which the rent was in arrears, and that that was reckless conduct. Roberts. And I do think the narrative, the first narrative is by far the more compelling as Judge Buchwald held, especially when you consider what's absent from this case. This is a pleading case. It is a pleading case, but under the Tellab's decision, and this Court's precedent, including Stratton McClure, it's the job of the district court to determine which is stronger, the non-culpable or the culpable inference. And when you consider all the factors here, Judge Buchwald made that Tellab's balancing correctly. The fact that the law. And we live in this new world. Well, it's not new now. We've been living in it most of the time I've been on the Federal bench. But this sounds more and more like summary judgment every day to me. But in any event, it's 12B-6. Understood. It's 12B-6, but not only post the plausibility standard, but also post Tellab's decision in the PSLRA, which was designed to create a particular standard for security claims like this. I grant you that. Let me interrupt you and ask you, because so let's talk about the August 9th 10-Q didn't Omega specifically indicate, it says, this is from Joint Appendix 44. It's paragraph 64 of the complaint. June 30, 2017, two of our top ten operators, Oriana and Signature, were approximately 90 days past due on rent payments to the company. And one of those operators, which turns out to be Oriana, has been facing liquidity pressures following management transition. That was the subject of and discussed in the earlier analyst conversation also in the May telephone call, I think it was. But then, curiously, it says, but has been showing signs of operational It wasn't making partial rent payments from receivables. It was making partial rent payments from a loan, wasn't it? I think the inference could be made that it was making partial rent payments from both of those sources. Why? I mean, I think of myself as an investor in a piece of real estate, and the landlord says to me, everything is hunky-dory. Everybody's current on their rent and everything, and then two months later, I find out that three of the tenants are in default, and the landlord's been paying the rent because he doesn't want me to know that three of the tenants representing a sizable portion of the income stream aren't paying it. I mean, when you have to borrow to pay, money's not coming in. You've got these people in a nursing home. Something's going on with what's going on in the nursing home. They're not having enough income flow to meet their obligations, right? Your Honor, there was disclosure, though, that the tenant was having significant problems. But they say making partial monthly rent payments. What do you mean? And, Judge, as Judge Buchwald found, there is nothing that in GAAP or in financial statement rules that Well, I understand GAAP, but the GAAPs, with all due respect, I don't understand what GAAP has to do with this. This is about funds from operation. And that's There's no allegation that Excuse me. Excuse me. You're enthusiastic. I appreciate that. But funds from operation aren't GAAP sensitive in the sense that they work just on measuring what's coming in, right? And it can come in from a loan. I appreciate that. And so to some degree, if someone accepts the FFO, the funds from operation figure, they're accepting something that can have in some degree reflect loan. I'll give you that. But when they say making partial monthly rent payments, doesn't that beg the question about where the money is coming from? It doesn't specify where the money is coming from. Okay. But that the question is, did the defendants have to know that they needed to disclose that, when there is no showing, no allegation that their accountants had an issue with this or thought it needed to be disclosed. No allegation that created a financial statement problem. No, in terms of an inaccuracy or an irregularity. No allegation that there was a motive to do this, some personal benefit on the part of the defendants. No, I agree with that. I agree with that. This is really a recklessness case. And where, in addition to the absence of these indicators that, hey, you really have to disclose this. After all, from their point of view, it's a $15 million loan by a company with $9 billion in assets. It doesn't appear to be a huge transaction. So, yes, arguably, in hindsight, given all that happened, it could result in material. But it did not result in Omega being able to hide from the market that a major tenant was having real problems. Because they told the market the tenant was having major problems. And ultimately, they also told the market it has been showing signs of operational improvement. It's currently making partial monthly rent payments. Even at the second quarter conference call, there's an experience. I'd feel deceived. Honestly, if I owned this stock, I'd feel deceived. Where one of the analysts said, so the current guidance is sort of good case FFO scenario where these issues get resolved, which sounds like is your expectation. But if they don't get it resolved, the guidance will be at risk. Is that right? The answer from Stevenson, that's fair. So the analysts understood that the condition of the tenant was dire enough that the guidance was at risk, that impairment was impossible, that cash basis in accounting was impossible. You commented on it. That's fair. I mean, there's a number of comments. Excuse me. I have another question for you about the loan. Isn't it correct that to the extent that this loan, I think it's, I think we know that the loan went primarily to two things, the tax payments by Oriana and rental payments to Omega. Isn't it correct? And I believe there are other expenses as well. Isn't it correct that you're talking about this loan as if it were an ordinary commercial loan and saying that the district judge said, you know, one doesn't make a loan without the expectation of being repaid. But to the extent, to the extent that the loan was going to rental payments to the lender, Omega, it didn't change Omega's financial situation at all. It wasn't putting out money. It was just transferring an obligation from a rental obligation into a loan repayment obligation. So that wasn't really a loan at all. It was a disguise of default in rental payments. That was no, that money didn't get put out. And there was no additional money put out at risk to the extent that that money went to pay Oriana's rent. Isn't that correct? Your Honor, to the extent it was used to pay rent, that's correct. To the extent it was used to pay government taxes or to the extent it was used to pay other expenses of the tenant, those are the three purposes that it was used for. That's not correct. And my question to you was, to the extent it went to pay rent, it wasn't putting out money at risk at all. It was just transferring the category of obligation from one that was, that would have been disclosed as arrears of rental to one that was not disclosed as a loan. Isn't that right? Well, it was not done to, for the purpose of avoiding disclosure that this tenant was having major problems and was well behind in its rent. So in that sense, I don't think it's correct. But it didn't result in nondisclosure of the fact that, but for the loan, they would have been substantially further behind in their rent. Understood, Your Honor. But when you look, I think the key point here is this. So can't one draw the inference, then, that this is not a loan that was made because it was a great lending opportunity for a lender? It was a loan that was made to try to keep a very important tenant afloat with the hope that the tenant will recover. Isn't that the fair inference, the motivation for the loan? Well, I think it's right. And also that it's a fair inference that that's not unusual or problematic. We're not talking about whether it's unusual. Or improper. We're talking about whether there was an obligation to disclose it as in conjunction with the statement that this tenant is 90 days overdue in rent when, in fact, the tenant would be 135 days overdue if the landlord weren't paying the rent for it. They did disclose that the tenant was engaged in a recovery plan. The loan can only be understood as an attempt to help the tenant with a recovery plan. That's an expression of optimism and faith. And ultimately, the optimism, you know, did not prove well-founded. And they quickly disclosed from quarter to quarter, over two quarters, this is a problem, the problems are getting worse, we're still hopeful that it will recover, but if it doesn't make it soon, we're going to have to pull the plug and go to cash basis accounting and impairment. In the very next quarter, they went to that. That sequence of events, monitoring the situation, making adjustments, and then quickly taking action, and in the midst of it, giving such cautionary language as to cause a major stock price drop, as alleged by the plaintiffs, that's not consistent with a scheme to defraud. That's consistent with trying to give the information we think we need. It's okay. There's no indication that the accountant thought they needed to disclose more. And so that's why it's understandable that they could think they were disclosing the material facts they needed to disclose, even if the loan is viewed in hindsight as arguably material. That's the distinction between clearly material at where, like the Christine Asia case, where it's a game-changing event. Either without the information, you don't know that there's a problem with this tenant. With the information, you know that there's a problem with this tenant. That's not this case. This case is about the particular degree of the problem or the particular things that Omega was doing to help the tenant. Those considerations of degree, the difference is not substantial enough to support the idea that they had to know they needed to disclose it, given all the absence of all of the other indicators that normally accompany fraudulent intent in a nondisclosure like this. As the Stratton McClure case looked at, at worst, they were negligent in their assessment of that materiality, but entirely understandable, given the size of the loan, given the lack of any crying need to disclose it. That is by far the stronger inference, and that's what Judge Buchwald found. Thank you, Your Honor. My friend and I agree that this is a case of the particular degree. And my friend says the question is whether the difference is substantial. And I'd like to enunciate a danger in his position. If you have the duty, Judge Wesley, and you have materiality, which the Court will assess at the pleading stage based on an objective standard, as will the finder of fact ultimately, and actual knowledge, to say that we are going to quibble about the difference is to say that we are giving a second bite at the materiality example, and nowhere in the statute and nowhere in the Supreme Court's or this Court's jurisprudence does that second bite appear. Once you have shown objective materiality, the subjective thoughts of the defendants evaporate in the face of their knowledge. If they are not, if they don't have actual knowledge, that's when this, well, this might be not clearly material arises. Absolutely a danger that you will allow registrants to avoid disclosing, Judge LaValle, the degree of the problem, as you noted. Judge LaValle, I wanted to pick up on the point that you were making, because once again, my friend says there's no gap violation. There's no gap violation. And we agree there's no gap violation. But item 303 is there precisely because in the absence of a gap violation where financials are materially accurate, there may be material information that investors absolutely required, lest they be deceived. And this is a case. But the, well, you started this. So, but what makes this a hard case is that there's no other, like there's no cooking the books. There's no self-dealing. There's no, I mean, the question really turns on whether they had a duty and they just turned their back on the obligation to disclose it. Judge Wesley, the danger. Because you've got to fit your center into the recklessness box, because you can't. I do. But if I may, I want to take you back to the Supreme Court's tell-labs decision, which requires a holistic analysis. And I believe that there is some tension between this Court's dual track, motive and opportunity or recklessness paradigm. I think it's wrong. And it's wrong because what Court ---- Unfortunately, you're stuck with it until the vote of the act is in an opinion en banc. I sure am, Judge Wesley. But here's what I want you to consider in the context of the Supreme Court's mandate. I don't think you'd ride that horse very far. No, no. I conceded. In the context of a holistic analysis where I do, I cannot plead that any individual defendant sold stock. And I've been in front of Judge Buchwald many times, and that's it for her. If there's no stock sale, there's no motive. I ask you to consider in a holistic analysis, though, the context of all of this. The industry was in difficult situation in 2016. And our friends at Omega said, we ---- it has stabilized. And all of a sudden, two of its top ten operators are in danger? That, even if it may not itself constitute motive, Judge Wesley, in our holistic analysis, we have to consider what Omega said. They said the market has ---- the industry. I beg your pardon. The industry has stabilized. If the industry ---- Roberts. My friend Judge Buchwald said something to the effect that lenders don't lend without the expectation of being paid. Right. Yeah. So when a ---- when the lender is the landlord and the loan is simply enabling the tenant to pay the rent so that the landlord is saying, okay, you can't pay your rent, now it's paid because I've loaned you the money and I'm marking your rent as paid and I'm marking that you owe us that amount of money as a loan instead of as rent. Under that circumstance, it is simply not true that landlords don't lend without the expectation of being paid. The motivation of such a loan is just to get the tenant's rental paid for whatever purpose, which in this case would be a very important purpose of improving the financial situation of Omega by not revealing that one of its major tenants responsible for 7 percent of its income is completely incapable of paying rent. To answer Judge LaValle, I want to take us back to the fact that we're at the pleading stage. And I ask you this. If we are entitled to reasonable inferences or equally as cogent and compelling inferences with respect to Center, I ask you to consider that if that's the way defendants felt and they know they have made the loan and they know under 303 they're obligated to disclose it, then why aren't they shouting from the rooftops, we just lent them money? There is an equally cogent and compelling inference that they wanted to hide the loan to hide the continuing delinquency. And, again, they can have an opinion that ultimately Oreada will pay Omega back. But at this point, why didn't they? If, as Judge Buchwald found, there is something positive about this loan, why then not disclose it? Just say, hey, we lent them money. Right? Number one. Number two, I also commend you to Judge Lohier's response to SAIC's identical defense. And, essentially, they said, why would we hide this rogue employee? Why would we hide this for three months? Well, if you don't know — Could you just — how do you — what do you conceive the Rule 303 obligation to be? To disclose what? Your Honor, I have — I will give it to you, Your Honor, from paragraph 78, which is on — I'm sorry, paragraph 76, which is in the record A55 to A56. And we lay it out verbatim. We lay it out verbatim. Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount reported income — of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses in the registrant's judgment should be described in order to understand the registrant's results of operations, in order to understand the results. If the results are accurate, there may be material information that you have failed to disclose, and Omega did. Thank you both. Very well argued on both sides. And nicely briefed, too. Thank you very much.